# EXHIBIT C

# BirdS Bird

Amsterdam District Court Case number:
675004 KG ZA19-1157 Session: 10 December
2019 at 13:30 hrs.

**CONCLUSION OF REPLY IN BRIEF CEDING**


*in terms of*


**Primark Netherlands B.V.**

established and having its registered office in Amsterdam

defendant hereinafter referred to as "Primark"

litigator: M. Rieger-Jansen
lawyers: M. Rieger-Jansen and N.Q. Dorenbosch *against*


**Airwair International Limited**

established in Wellingborough, United Kingdom

claimant

hereinafter referred to as 'Airwair'.

lawyers: A.M.E. Verschuur and L. Bekke


The defendant denies and contests all that has been stated by the plaintiff in the summons and productions, except to the extent that the following is explicitly acknowledged.

1

# Bird & Bird

## I.   INTRODUCTION

1-   The present case concerns five shoes sold by Primark (collectively referred to as **'Primark Products'). On the basis of** its registered trademarks as well as the copyright that Airwair allegedly holds in respect of the Dr. Martens shoes invoked here (hereinafter jointly the **"Dr. Martens shoes") or on the basis of** slavish imitation, Airwair Primark tries to prohibit the sale of these shoes.

2-   What Airwair is actually aiming for in this procedure is to monopolize a popular style or trend as a whole and to prohibit Primark from following this trend despite the fact that the market is full of it. This is not what intellectual property rights or the doctrine of slavish imitation are intended for. It is a fundamental principle of intellectual property law and also of competition in general that style must remain free.

3-   The shoes invoked by Airwair in these proceedings are the 1460 lace-up boot (the **"1460"),** the Jadon lace-up boot (the **"Jadon"**) and a classic Chelsea boat called 2976 (the **"2976").** Each and every one of them is a design that lacks originality. The 1460 is no different from a standard army boot or workman's shoe, platform soles - and also army boots with platform soles have been around for years - and the Chelsea boat was already a favourite of Queen Victoria in the 19th century.

4-   Airwair is also fortunate that its products are currently in line with the "key trend" in women's fashion. All shops are currently full of army boots, both the standard flat version and the hip version with a "chunky" sole. The classic Chelsea boots are also currently making a comeback. Dr. Martens cannot be allowed to monopolize an entire style, especially now that her own shoes are derived from already existing models. Airwair is in fact illegally trying to prevent other operators - including Primark - from participating in a particular trend, of which the Dr. Martens brand is only a part, but which in no way belongs exclusively to Airwair.

5-   As will be explained below, Primark considers that both the trade mark rights and the copyrights invoked by Airwair in these proceedings are invalid. With regard to copyright and the slavish imitation, it also applies that the summons in this respect is so short that Airwair has not even fulfilled its duty of attorney. For example, not a single one has been substantiated as to why Airwair would be the copyright owner.

Even in the unlikely event that your Court does not fully follow Primark with regard to the validity of the rights of Airwair, Primark has in any case placed such doubts that the validity of these rights cannot be assumed in interlocutory proceedings. [1]

Rb The Hague 22 October 2015, ECLI:NL:RBDHA:20i5:i242i (XO).

# Bird & Bird

7-   To reinforce the validity of these rights, Airwair apparently has the tactic of drowning Primark and your Court in material. She has submitted no less than nine hits of material. As will be explained below during the discussion of trademark law, almost all of this material is completely irrelevant. Moreover, it seems that Airwair only wanted to create volume, but no content. The material is full of double advertisements and articles, some of which can even be found twenty times in a row, in the same production or in different productions.

2

8-    Finally, Primark hiema will explain that - even in the event that your Court unexpectedly reaches the conclusion - Airwair's rights would be valid, at least not being infringed by Primark. The Primark Products simply fall within the same style as the Dr. Martens shoes, but have expressed that style in their own way, complementing it.

## II.    NO TRADE MARK INFRINGEMENT

### II.i. The trade marks invoked by Airwair are invalid: lack of distinctive character

9-    Airwair invoked the following four brands in these proceedings:

I.    Benelux shape mark with registration number 0588723, filed on 6 February 1996 and registered for *'Footwear, him parts and accessories not included in other classes'* in class 25, as shown below, with the description that *'The distinctive elements of the mark consist of the occurrence of grooves in the edge of a shoe sole, including the edge of the strip between the upper leather and the shoe sole, which is of a darker colour':*



II.    Benelux shape mark with registration number 0588725, filed on 6 February 1996 and registered for *'Footwear, their parts and accessories not included in other classes'* in class 25, as shown below:

*fC \*



# Bird & Bird

III.    Benelux shape mark with registration number 0588726, filed on 6 February 1996 and registered for *'Footwear, their parts and accessories not included in other classes'* in class 25, as shown below:



IV.    Benelux shape mark with registration number 0588727, filed on 6 February 1996 and registered for *'Footwear, their parts and accessories not included in other classes'* in class 25, as shown below:

These brands will be jointly referred to hereinafter as the **'Airwair Brands'** and individually as **'Airwair Merk I', 'Airwair Merk II', 'Airwair Merk III'** and **'Airwair Merk IV'** respectively**.**

Primark immediately notes that the filing date of these trademarks is important. Until 1 January 1996, the Benelux Office for Intellectual Property (hereinafter referred to as 'the **BOIP'**) did not have a test on absolute grounds. Trademarks were entered in the register without prior verification of their content. The Airwair brands date 00k

3

from a period when the BOIP just started with such a key.

When this test was introduced, the Common Comment of the Governments stated that the BOIP should only refuse "manifestly unacceptable" deposits. [1234] It is therefore a question of a volatile cn light test, which guarantees that the registered trade marks meet the requirements to be imposed on them. It was not until 2003 that the BOIP was first revoked by the Court of Justice of the European Union ('ECJ') in respect of this too limited form of review, when it was decided that Directive 89/1043 did indeed result in *"no minimum examination in the context of the application for registration"A* Indeed, *"the examination must be rigorous and exhaustive in order to prevent trade marks from being wrongly registered".5* Even more explicitly, the *Post Office* judgment states that Directive 89/104 *"opposes the practice of a trade mark registration authority in which only the registration of "manifestly inadmissible" trade marks is refused".[5]*

The Airwair Trademarks have never been tested against the correct standard and have been wrongly registered. This is further reinforced by the fact that the strict jurisprudence on shape marks,

## Bird & Bird

which will be discussed in more detail below, did not develop until a number of years after the Airwair Brands' filing date.

13- In the light of these facts, it is not possible to assume a presumption of validity in this case, and it is appropriate to carry out a voile review of validity, whereby the burden of proof with regard to the validity of the trade marks relied on by it must already lie with Airwair on the basis of some of the fact that the trade marks were not fully assessed at the time.

14- In addition, Primark brought an invalidity action against all trademarks invoked by Airwair before the BOIP (see **Production i).** Primark is confident that the Airwair Trademarks will be annulled in these preliminary relief proceedings within a not inconsiderable period of time after the judgment has been handed down. Primark will then request your court to take this circumstance into account, as well as the expected outcome in proceedings on the merits.

### II.1.1.   No distinctive character from home

ib- The Airwair Brands are all shape brands. This is indicated in the registration and is also apparent from the images of the bet mark included in the registration.

Although the criteria for the distinctive character of shape marks are the same as for other types of marks, in applying those criteria it must be taken into account that the perception of the mark by the average consumer will not be the same in the case of a shape mark as in the case of a word mark or logo.[6][7][8]

---

[1] Explanatory Memorandum to the Protocol on Amendments to the Uniform Benelux Law on Trademarks of 2 December 1992, p. 8.
[2] First Council Directive 89/104/EEC of 21 December 1988 to approximate the laws of the Member States relating to trade marks.
t ECJ 6 May 2003, C-104/01 *(Libertel/Benelux-Merkenbureaii),* paragraph 59.
Same thing.
[5] ECJ February 12, 2004, C-363/99 *(Post Office - Koninklijke KPN/Benelux-Merkenbureau),* para. 1126.
[6] For the sake of completeness, it should be noted that for Benelux trademarks - unlike Union trademarks - there is in any case no provision for a presumption of validity in infringement proceedings.
[5] See, inter alia, ECJ 12 February 2004, C-218/01 *(Henkel KGaA),* paragraph 52; ECJ 7 October 2004, C-136/0-2 *(Mag Instrument Inc./EUIPO),* paragraph 30; ECJ 22 June 2006, C-25/05 *(Storck/EUIPO),* paragraph 26-27.
[7] See, inter alia, ECJ 22 June 2006, C-25/05 *(Storck/EUIPO),* paragraph 25; ECJ 29 April 2004, C-473/01 & C-474/01 (Procter & Gamble), *paragraph 33-35*; CFI 27 June 2017, T-580/15 (Flamagas)*, paragraph 68.*

17' According to established case law, the distinctive character of a trademark must be examined on the basis of two factors.9 First of all, the goods and services for which registration or protection is requested must be examined. Secondly, the perception of the sign by the relevant public should be considered.

1^- The Airwair Trademarks are registered in class 25 for footwear (including its parts and accessories); a product offered on a large scale to the general public. In the present case, it is therefore a question of the perception of the average consumer.

t9- With regard to the perception by the relevant public, the Airwair Marks are inseparable from the appearance of the products themselves. In the case of Airwair Merk I, II and IV, it is about the appearance of a shoe sole, as with regard to Airwair Merk I also follows from the description. In the case of Airwair Brand II, the brand looks at the appearance of the entire shoe.

# Bird 

2'- The court has already ruled in a similar way with regard to the K-Swiss trademark depo
stripes on the side of a shoe:



The Court of First Instance decided in this case that the fact that the trade mark application consists of a two-dimensional representation of the shape of a shoe with five parallel stripes or of the positioning of five stripes on the side of a shoe means that the trade mark coincides with the appearance of the product.[910]

In the same sense, the Court of The Hague ruled last year that Birkenstock's trademark filing shown below also coincides with the appearance of the goods with regard to the pattern on the sole of a shoe:[11]



23' The question of whether the trademark can be distinguished from the product itself is crucial since, according to established case law, the average consumer is not accustomed to seeing signs which coincide with the product as an indication of origin. [111213]  Such signs will only have distinctive character indicatively they may deviate from dc standard or gcbruikcn in the rclcvantc sector.'3

24-    In its writ of summons, Airwair has not shown that this would be the case and this is not apparent from the trade mark registrations either.

25-    **Airwair Brand I** consists of a simple pattern of grooves on the side of a sole according to the brand's description, with the edge of the strip between the upper leather and the sole of the shoe being darker in colour. In the same sense as the Court of The Hague already ruled on Birkenstock's pattern above,^ the overall impression evoked by this sign is banal and does not represent more than the sum of its components.

[9]  Judgment 13 June 2014, T-85/13 *(K-Swiss)*, paragraphs 21 & 24.
[10]Rb. Den Haag 14 raaart 2018, ECLI:NL:RBDHA:20l8:3074 *[Footsie/Birkenstock)*, paragraphs 4.6-4.7.
[11] ECJ 29 April 2004, C-473/01&C-474/01 (Procter *& Gamble), paragraphs 36-37*; ECJ 7 October 2004, C-136/02 (Mag *Instrument Inc./EUIPO), paragraph 2.o.* 30-31; ECJ 12 February 2004, C-218/01 *(Henkel KGaA)*, paragraph 48-53; ECJ 22 June 2006, C-25/05 (Storck/EUIPO), paragraph 27-28; ECJ 12 January 2006, C-173/04 *(Deutsche Sisi-Werke GmbH&Co/EUIPO), paragraph 48-53*. 31; CFI 16 January 2014, T-434/12 *(Margarete SteiffGmbH v EIB);* CFI 15 June 2010, T-547/08 *(X Technology Swiss GmbH v EIB)*, paragraph 1.o. 25 as confirmed by the Court of Justice on 16 May 2011, C-429/10; Court of First Instance on 11 July 2013, T-208/12 *(Think Schuhwerk GmbH/EUIPO)*, at paragraph 37 as confirmed by the Court of Justice on 11 September 2014, C-521/13; Court of First Instance on 13 June 2014, T-85/13 *(K-Swiss, Inc./EUIPO)*, at paragraphs 16-17.
'3 Ditto.
[13] Rb. The Hague 14 March 2018, ECLI:NL:RBDHA:20l8:3074 *(Footsie/Birkenstock)*, paragraph 4.8.

# BirdS Bird

²⁰⁾- An uneven finish on the side of a sole has been around for years. For example, espadrille plaited soles have existed since the *14th* century, so-called "stacked heels" have been made from different layers of leather, plastic or bolt since the 19th century, different colours have been applied to the side of the sneaker soles since the 1980s, the granular finish of a rubber crepe sole 00k is known as it has been for years, and the grooves of the bordeel creeper have been known since 1949 **(Production** *2).* There are then 00k an infinite number of designs possible and Airwair Merk I is not so special or so different from the other possibilities that for the average consumer from home bet would be regarded as an indication of origin.'s The fact that the sole from Airwair Merk I would contain two colours does not make this any different.

²⁷- This applies in the same sense to **Airwerk Merk IV.** were it not for the fact that this trademark does not have a description and therefore it cannot be determined on the basis of the registration whether the trademark should be interpreted as grooves - as described by Airwair for Airwair Merk I - or as the simple stripes that are shown on the image in the registration.

²⁸⁾ **Airwair Merk III** shows the design of the insole of a shoe. This design is particularly relevant for technical reasons to ensure that a shoe has sufficient grip. The simple pattern of stripes and coves shown in Airwair Merk II is banal and does not allow the consumer to determine the origin of the shoe purely and simply on that basis. Geometric patterns are common on the soles of shoes. ¹⁴¹⁵¹⁶  The Chambers of Appeal of EUIPO have already found on several occasions in similar cases that the design of a footwear sole does not possess distinctive character of its own accord. See, for example, the decisions of the Board of Appeal with regard to the following shoe soles:'7

29- Finally, 00k of **Airwair Brand II** cannot be said to deviate so much from the industry standard that this brand can be seen as distinctive *ab initio*. Airwair Merk II simply shows a design of a lace boot. However, nothing about this

 

boot on its own or in combination is significantly different from the norm. In a similar sense, the EUIPO Board of Appeal has already decided with regard to other shoes that they do not have any distinctive character by their very nature.¹⁷

For example, the Board of Appeal ruled as follows with regard to the Timberland boots:

---

¹⁴Compare Rb. The Hague 14 March 2018, ECLI:NL:RBDHA:20I8:3074 *(Footsie/Birkenstock),* paragraph 4.8.
¹⁵ General Court 9 November 2016, T-579/14, at paragraph 133.
⌐EUIPO Board of Appeal 27 June 2017, R 952/2014-4; EUIPO Board of Appeal 15 September 2008, R 714/2008-2.
See for example EUIPO KvB 25 April 2017 {Timberland*),* R 1457/2016-1; EUIPO KvB 22 June 2017 *(Sheri Industrial),* R 1757/2016-2.

# Bird & Bird



*"When buying boots a consumer will not pay a particularly high degree of attention to how many rows of stitching are present, how the padding is used on the outer edge [...], these will be a style choice on the part of the consumer."* [9]

*"[...] when considering the impression of the mark as a whole, the combination is simply a stylish boot with a number of design elements, rather than a distinctive badge of trade origin that can immediately enable the relevant consumer to tell the boot apart from similar offerings."* [18] [19]

3°- Already on the basis of the above, it must be concluded that the Airwair Marks lack any distinctive character. In the above assessment, it is important to underline that a brand coinciding with the appearance of the product can only have distinctive character if, as mentioned above, it deviates <u>significantly</u> from the practices in the relevant sector. A simple derogation has been found by the Court of Justice to be almost insufficient.[20] There is no significant deviation at Airwair.

3    [1-]    This is also reinforced if one looks at the market at the time of the deposit of the brands **fProductie** ah The productions of Airwair itself indicate that stiff lace boots in the 90's of the last century were simply a well-known trend. For example, an article in Schoenvisie reads *"Chanel does not send his models onto the catwalk in tempting black and red edges at the beginning of the nineties of the last century, with black army coffins underneath. Dolce & Gabbana combines lovely tulle with tough combatboots. This will make the coffin definitively commonplace."* Also on overviews from the time all kinds of boots with sturdy soles are shown, like for example the page below from Production 6.J.II.2:



---

[18] EUIPO RvB 25 April 2017, R1457/2016-1, paragraph 20.
[19] Idem, r.o. 23.
[20] ECJ 12 Febmari 2004, C-218/01 *(Henkel KGaA),* paragraph 49.

# Bird & Bird

Especially in this market, the Airwair brands do not deviate *significantly from* the practices in the footwear sector.

32-   If the Airwair Brands were filed now, they would never be accepted.[21] This is also evidenced by the fact that the Spanish trademark applications filed by Airwair earlier this year for the sole of its shoe (in accordance with Airwair Merk III in these proceedings) were promptly responded to with an objection by the Spanish trademark office **fProduct 4).** On the basis of the same legal framework that also applies in this case - namely the European Trade Mark Directive - the Spanish Trade Mark Office has indicated that Airwair's trade marks are devoid of any distinctive character and also consist of signs which may serve to indicate the quality or characteristics of the goods.

33-   Airwair itself also appears to have realised that the Spanish Trademark Office could not take a positive view of trademark applications in the light of current European case law and apparently had so little confidence in the validity of its filings that it withdrew the applications without further defence **(fProduction s).** It should also be noted that this withdrawal took place one day after the letter of summons to Primark US. At the time of the letter of summons and this writ of summons, Airwair was therefore already aware of the questionable validity of its trade marks.

34' The other three trademarks invoked by Airwair in these proceedings - in respect of the side of the sole and the design of the shoe as a whole - have not even been attempted by Airwair to register in Spain (or, more recently, in another European Member State) despite the fact that it does not yet have protection for them in Spain or as a Union trademark. It therefore appears that it has even less confidence in its validity.

35-   Summarising the above, it can be concluded that the Airwair Brands lack any distinctive character within the meaning of Article 2.2a(i)(b) of the BTIP. The consumer will not regard the sole and also the design of the shoe that Airwair is trying to protect with its trademarks - on its own and separately from any brand name affixed to it, as well as from any use that may have been made of the trademarks - as an indication of origin, but purely as a decorative design that cannot be dissociated from the shoes or soles themselves and does not, at least insufficiently, deviate from the standard in the sector.

### II.1.2.   No distinctive character due to use

36-   Airwair did not claim in its writ of summons that the Airwair Trademarks had acquired distinctive character as a result of integration. It merely claimed that the trade marks would be known. Should Airwair nevertheless wish to make an appeal to integration, then it applies that it has not provided, or at least insufficiently, proof of this. The bare assertion that the Airwair Brands would be known and thus have a stronger distinctive power is insufficient in this respect. 23

---

[21] Even if one were to take account of what was customary on the market at the time of the filing of the Airwair Brands in 1996.
[23] See paragraph 34 of the summons.

9

# Bird Bird

37- With regard to the alleged reputation of the Airwair Brands, Airwair submitted in Production 6 a complete 'encyclopedic' full of material. Airwair is clearly trying to impress with quantity now that it is apparently unable to do so with quality. These documents do not in any way show that the Airwair trademarks at issue - the shape and specific characteristics of the shoe and sole and thus the word mark DR. MARTENS - have acquired distinctiveness through use.

38- It should not be up to Primark or your Court to guess where in the nine folders of Airwair there would be evidence of the use, reputation or distinctiveness of the trademarks invoked by Airwair. Certainly not when Airwair submits the same articles up to 20 times in order to create volume, sometimes in the same production one after the other, sometimes in other productions. [2**] Because of this one gets when looking at Production 6 again and again a deja-vu feeling with regard to the specific articles, but one becomes little wiser about the familiarity or distinctiveness of the Airwair Brands invoked here.

39- The vast majority of the material submitted by Airwair as Production 6 does not even show the specific characteristics of the shoe and sole from the Airwair brands. For example, the material only mentions the word mark DR. MARTENS, is of such poor quality that the characteristics of the shoes shown are not visible at all, shows all kinds of other shoes that are completely irrelevant for the current procedure, such as heels or sandals, or only shows accessories of the brand Dr. Martens. See examples below, both of which are repeated in Airwair's material, including Production 6.J.I.4 and 6.J.II.5 respectively:

 

4°- Airwair has not demonstrated through its productions that the average consumer at the time of filing of the Airwair Trademarks in 1996 was designing the shoe *itself* or even only the side or bottom of the sole - without mentioning the word mark DR. MARKETS or AIRWAIR -

---

^ See for example the article "Dr. Martens comes to Holland with clothes" that has been included at least 25 times in Airwair's Production 6.J.II.2.

1

# Bird & Bird

...as an indication of origin. This is further reinforced by the fact that Airwair already marketed several models which to a greater or lesser extent, or not at all, contain the elements of the Airwair brands. This use also prevents the public from interpreting the combination of elements as a trademark. With regard to Airwair Merk III, it can also be noted that it is located under the shoe and will therefore hardly be visible in normal use.

4     It should be         noted that the mere evidence that a sign is being used is not sufficient to demonstrate integration; it concerns the use as a trademark, as a result of which the consumer has come to recognise it as an indication of origin.

4     [22]-From         Airwair's material, Primark also seems to indicate that Dr. Martens' products have only been on the market in the Netherlands since 1993 and in Belgium since 1994. An own shop of Dr. Martens only followed long after the registration of the trademarks, namely in the Netherlands in 2014 and in Belgium in 2015.[25] This makes it all the more unlikely that the Airwair Trademarks would have been established in such a short period of time from 1993/1994 up to and including February 1996. Primark emphasises that the trademarks are registered for "footwear" in general and that the assessment of integration is therefore about the perception of the general public. [26]

43' Finally, it should be noted that according to established case law, the integration of a Benelux Trademark must be proven in respect of the entire Benelux territory. 2? Although Airwair states in its production overview that in Production 6.J.I.1 it submitted press publications from the Benelux for the period 1993-1997, there is not a single indication in the material itself that this would affect Luxembourg as well as Belgium.

### II.1.3.   Loss of distinctive character as a result of negligence or fault on the part of the proprietor of the trade mark

44-   Even if your Court should unexpectedly come to the conclusion that the Airwair Trademarks would have distinctive character at the time of their filing, the Trademarks have now become a "name" customary in the trade for shoes within the meaning of Article 2.27 of the BTIP.

45-   As can be seen from the judgment of the Supreme Court in *Bach flower Remedies v Healing Herbs,[28]* with reference to the *Levi Strauss v Casucci judgment of* the ECJ,[2 this] provision is not limited to word marks despite the term 'designation'.

46-   As will be discussed in detail below in the chapter on slavish imitation, the examples of shoes with a similar design and similar soles are currently plentiful.

# Bird & Bird

The fact that the Airwair trademarks are (or have become) customary is also due to the negligence of the trademark owner. The availability of all these similar models does not indicate that Airwair has consistently acted on the

---

[22]s See screenshot of <thedenimdaily.com> in Production 6.J.II.13 with respect to the Netherlands and first article in Production 6.J.III.9 with respect to Belgium.
[26] EUIPO RvB 25 April 2017, R 1457/2016-1, paragraph 13; Rb. The Hague 22 May 2019, ECLI:NL:RBDHA:20ig:5i89 {Diesel/Galvin Klein), paragraph 4.4.
[22] ECJ 7 September 2006, NJ 2007/238 *(Europolis).*
[28] HR20 January 2012, ECLIL:NL:HR:2012:BU7244, paragraph 4.4.1.
[29] ECJ EC 27 April 2006, ECLI:EU:C:2006:264.

Benelux market since its filing and has not demonstrated this either.

### II.2. The trade marks invoked by Airwair are invalid: permanently excluded from the protection of trade marks.

47- Pursuant to Article 2.2a (i) (e) (iii), a trademark is invalid if it consists exclusively of a shape that, or other characteristic that, gives an essential value to the goods. This is the case with the Airwair Brands.

48- Shoes are pre-eminently a product that is bought because they are designed to be beautiful. As the Court of The Hague already considered in the *Louboutin case, the* appearance of the shoe always plays an important role in the purchase decision.3°

49- The shoes of Dr. Martens are also sold mainly because of their aesthetically attractive shape. This is shown, for example, by the reviews of the Dr. Martens JADON boots on the Dr. Martens website; each and every one of them indicates that they think the shoes are so beautiful:



3° See also Rb. The Hague l April 2015, ECLI:NL:RBDHA:20l5:373l (Louboutin/Van Haren), paragraph 4.25.

1

# Bird & Bird

50.

Also with regard to the 1460, the main reason for purchase is that buyers like the shoe:



5   1-      Airwair Merk II - which relates to the design of the Dr. Martens shoe as a whole and has been invoked by Airwair both with regard to Primark's flat lace boots and with regard to the lace boots with platform sole - therefore consists exclusively of a shape that consumers are looking for because of its beautiful appearance.23

---

232-   The other Airwair brands also serve an essential aesthetic purpose. For example, Airwair's own article "We're going to be a bit tough this winter" (see Production 6.J.II.2) shows that consumers are looking for a rugged look: *"The clumsy, the more beautiful"*, with a specific search for *"Rugged leathers, striking last shapes with tough noses, coarse decorative stitching, heavy-profile non-slip soles and long laces.".* Airwair Merk I, III and IV also consist solely of forms that consumers may be looking for from an aesthetic point of view. On top of that, Airwair Merk III can be sure that the

1

# Bird & Bird

profile is necessary to obtain a technical result. If that mark is not already excluded from the protection under Article 2.2.a(i)(e)(iii) of the trade mark law, it is necessary that at least the first paragraph of Article 2.2.a(i)(ii)[31] of the same Article be interpreted in such a way that it does not affect the rights of the proprietor or the proprietor of the goods.

53- The forms that Airwair tries to protect with the beer invoked trademarks therefore serve an essential aesthetic (and/or technical) interest. For the monopolization of such forms, the right - potentially infinite - conferred by a trademark is never intended. Such forms are therefore excluded from trade mark protection for good reason.[32]

54- It should be noted here that a shape which is necessary to obtain a technical result or gives essential value to the goods can **never** constitute a valid trade mark, even if it would have acquired distinctive character through incorporation. This follows from established case law of the Court of Justice.[33]

### II.3. The trademarks invoked by Airwair are invalid: no sign within the meaning of Article 2.1 BTIP

55- In particular with regard to Airwair Merk I and IV, it is completely unclear what Airwair intends to protect with this. As decided in the Sz'ecfcman judgment of the Court of Justice[34] and in the meantime also in Article 2.1(b) of the BYTE, a trademark must be displayed in the register in a way that enables the competent authorities and the public to clearly and accurately identify the subject of the protection granted to its proprietor.

56. With regard to the Airwair Trademarks I and IV, based on the images in the trademark registrations, it is completely unclear what Airwair intends to protect with this:

 

57' in the subpoena Airwair talks about grooves, but this is not reflected in the registration. The image rather shows a kind of interrupted stripes on the side of the sole.

58- The description that was added to Airwair Merk I does not change this, as follows from the ECJ *Dyson.35* In that case there was a trademark application for a transparent collection bin for vacuum cleaners and also in that case the images included in the deposit did not make it clear exactly which transparent collection bin Dyson wanted to claim. Dyson had also added a general description to its trademark: *"[the] trademark consists of a transparent container or*

---

For the sake of completeness, Primark notes that in this respect it is not relevant whether this technical effect can also be achieved by other means, see ECJ 18 June 2002, C-299/99 *(Philips/Remington)* and ECJ 14 September 2010, C-516/10 *(I,ego Juris/EUIPO).*

[32]  ECJ 18 June 2002, C-299/99 {Philips/Remington), paragraph 78.
[33]  ECJ 20 September 2007, C-371/06 *(Benetton/G-Star);* ECJ 18 June 2002, C-299/99 *(Philips/Remington),* at paragraph 75.
[34]  ECJ 12 December 2002, C-273/00 *(Sieckman).*
[35]  ECJ 25 January 2007, C-321/03 *(Dyson).*

# Bird & Bird

*collection chamber forming part of the outside of a vacuum cleaner, as shown in the diagram'.* The ECJ rejected

the entire application because there was no specific sign here, but Dyson tried to claim the concept of a transparent dustbin.

59- Also in the case of Airwair I, Airwair indicates with the description in the trademark that it is trying to claim protection for the abstract concept of *"preventing grooves in the edge of a shoe sole"*. This is not further specified by the image in the registration, as there are no grooves visible on it at all. The protection of such an abstract concept is not possible in trademark law since - to use the words of the ECJ - *"an unjustified competitive advantage"* would be obtained.[36] From this perspective too, Airwair Trademarks I and IV are therefore not valid.

### II.4.        No brand infringement

6°- In view of the non-negligible chance that Airwair's shape marks in proceedings on the merits, or before that, will be declared null and void in the invalidity actions brought by Primark before the BOIP, Airwair's trademark claims must already be rejected on that ground. However, even if the Airwair Marks were to be considered valid, there would be no infringement by Primark, as will be explained below.

#### II.4.1.    No use as a brand

6      First,       Primark does not use the allegedly infringing signs as a trademark, but only to decorate its products. They will not be construed as distinguishing marks.

62-   Airwair claims, with reference to the *Arsenal/Reed* judgment, that there is use as a trade mark because the signs are used in the course of a commercial activity and not in the private sphere? It is indeed true that Primark is a commercial party marketing shoes, but this does not make the use of the disputed aesthetic features into brand use. As also follows from *Arsenal/Reed,* the trade mark proprietor cannot oppose the use of a sign if this is contrary to the functions of the trade mark, for example if it is used for purely descriptive purposes or, as here, for purely decorative purposes.[38]

63-   in the CeZme judgment, the ECJ specified that the essential functions of the trade mark are jeopardised only if a sign is used by a third party for its goods in such a way that consumers can perceive it as an indication of the origin of the goods or services in question39 .

6-4-that's        not the case here. No consumer would think that he or she was using the form of the
      the shoes that Primark markets, or even only on the basis of their sole, can say something about the origin of those
      shoes. This is not changed by the - otherwise incorrect -

[36]   Idem, r.o. 34.
[37]   Zic subpoena, paragraphs 24 to 25.
3B ECJ 12 November 2002, C-206/01, *(Arsenal/Reed),* paragraph 54.
[39]   ECJ, r.o. 27.

# Bird & Bird

Airwair's statement in paragraph 48 of its subpoena that Primark would make consistent use of the Airwair Brands. Airwair directly contradicts itself in paragraph 61 of the summons, stating that Primark does not always use the disputed design elements. Even if the design elements were to be used consistently, this does not mean that they would be perceived by consumers as indications of origin, which is required for use as a trademark.

#### 11.4.2.    The use of a sign that has no distinctive character cannot be prohibited (Article 2.23 of the BTIP).

65-    in line with the above, the provision of Article 2.23(1)(b) of the BIE is 00k. According to that article, a trade mark does not confer on its proprietor the right to prohibit a third party from using, in the course of trade, signs or indications which do not have distinctive character.

66-    Certainly if one looks at the current market, it cannot be said that the allegedly infringing signs that Primark would have used have any distinctive character. This is a completely general lace-up shoe, an undersole with some stripes on the relief and in four of the five products in question some stars in the middle, and grooves on the side of a sole. The average consumer will never feel, when seeing one of these Primark shoes, that it is a sign that would allow them to see the origin of these products.

### 11.4.3.    No similarity between *Primark's brands and products*

67■Ook if your court should assume that the Airwair Brands are valid,
that there is also use as a trademark and that the signs used by Primark are distinctive, there can be no question of infringement. Indeed, there is no similarity between the Airwair Brands and Primark's shoes.

If the factors discussed above do not already lead to the invalidity of the invoked trademarks - as Primark primarily advocates - then what has been explained above will in any case have consequences for the scope of protection of these trademarks. This means that the scope of protection of the Airwair Brands should be interpreted in a very limited way. It is therefore impossible for Primark products to fall within the scope of this protection.

69- According to established case law, similarity between a trademark and an allegedly infringing sign must be assessed on the basis of the overall impression that the signs make on the average consumer.^0[24]

# Bird Bird

7°- In paragraph 21 of its summons, Airwair has included a table to compare the allegedly infringing products of Primark with the trademarks invoked in respect of each of these products. However, both the products of Primark and 00k the Airwair Brands are hardly to be seen. A close comparison of the Airwair Brands and Primark products quickly reveals that there is no resemblance.

---

[24] ECJ 11 November 1997, C-251/95 *(Puma/Sabel)*.

*Primark veterinarians*1*

| Airwair Merk II | Primark product |
|---|---|



[71]- In the images above it is immediately noticeable that Primark's lace boots (hereafter: the **"Primark lace boots"**) have a prominent zipper in the middle of the shoe, which is not reflected in Airwair Merk II. On the other hand, the Primark shoe lacks the striking stitching on the rim.[25]

# Bird & Bird

between the (artificial) leather and the sole as shown in the depot, the Primark shoe has much coarser grooves on the side of the sole than in the depot, the Primark shoe contains a separate heel piece that consists of a different piece of material than the rest of the shaft and the back straps, It has double stitching along the lacing holes and double stitching at the connection of the shaft to the nose instead of the striking and further apart triple stitching in Airwair Brand II, the Primark shoe, unlike the depot, has no turned over stitching at the top of the shaft and no visible seam between the nose and the tongue of the shoe. The entire shape of the shoe is also different, as the Primark lace-up boot has a much sharper, elongated nose than the Airwair brand

---

[25] For the sake of convenience, Primark will treat the comparison between the brands used and the lace boot at once with regard to the black, white and dark red versions.

and a much shorter, technically motivated heel loop.

72- The application of some stitching to the shoe is simply required for technical reasons to assemble the shoe. Therefore, Airwair cannot derive any protection from this. Especially in this respect, Primark's stitching differs considerably from Airwair Brand II.

73' The overall picture that emerges from Airwair Merk II on the one hand and the Primark lace-ups on the other hand is therefore completely different. The Primark shoe creates an overall picture of a much sharper, less clumsy shoe that does not have the Airwair Brand II's distinctive large heel loop and striking stitching around the sole, and also features a strikingly different stitching and a zipper at the top.

| Airwair Merk III | Primark product |
| --- | --- |



74- Also Airwair Merk III and the Primark veterinarians don't match at all in terms of overall impression. The crosses or arrows in the middle of the Primark sole give a completely different picture, and the different back and front of the bei's sole also influence the different overall picture.

75- It should also be borne in mind that the sole tread pattern is designed primarily, if not exclusively, to achieve a technical effect, i.e. grip on the sole.

1

# Bird & Bird

subsurface. If this does not deprive Airwair Merk III of its validity, this will have a strong influence on the scope of protection. It should also be noted that the blocks on the outside of the sole are technically defined. An inlet on the inside of these blocks and a recess between these blocks provides more grip than a single flat or blocks without inlets.

| **Airwair Mcrk IV** |  |
|---|---|
| **Primark product** | |

76-    With regard to Airwair Merk IV, it should first of all be noted that it is completely unclear what Airwair intends to protect with this. The image in the trademark registration seems to have interrupted horizontal stripes. The fact that these are grooves does not follow from the trademark registration. It is not acceptable for the trademark owner to artificially increase the scope of protection of his trademark by filing an unclear image. In contrast, if uncertainty arises as a result of the method of registration, this must be explained to the detriment of the trademark owner. In the present case this means that the trademark owner has missed her chance to claim successful grooves and she has never received protection for them.

77'    But even if one stresses that these are grooves, it is noted that the grooves of the Primark shoe are much coarser than the fine, dense stripes of Airwair Brand IV and that the shape of the sole of the Primark shoe is rounded rather than the straight finish in the trademark registration. In view of the objections concerning the distinctiveness of this trademark as well as the lack of clarity of the application, as explained above, this trademark can only have a very limited scope of protection if valid. The uncertainty caused by the vague image in the depot cannot lead to the protection of all conceivable forms of grooves in the side of a sole.

78*    As a result of the above illustration of the allegedly infringing sole, Primark once again asks you whether the average consumer - solely on the basis of this sole, without any other aspect of the shoe - would think that he would be able to deduce the origin of this shoe from it. That's what Airwair is trying to protect with Airwair Brand IV.

# Bird & Bird

*Primark Chelsea boat*

| Airwair Merk I en IV |  |
|---|---|
| **Primark product** | |

79. The limited scope of protection should also be emphasised with regard to Airwair Merk I. Comparing the above images, it is noticeable that the sole of the Chelsea boat marketed by Primark (the **'Primark Chelsea boat'**) has completely different coves. The coves in the Primark shoe are smaller, closer together and present in greater numbers. It is also immediately noticeable that the Primark sole is fitted with a brag42 that runs straight down. This wakes up the indrak that the sole has a standard heel instead of a diagonal inlet and gives the sole a completely different total inlay than Airwair Merk I and IV.

| **Airwair Merk III** |  |
|---|---|
| **Primark product** | |

Also between Airwair Merk III and the sole of the Primark Chelsea boat there is no agreement. The inlets in the cubes on the outside of the sole are not on the inside, but on the side of the shoe. This is a very technical element, now that it determines what the grip of the shoe is based on - it is distributed over the outer edge of the shoe as with the Primark boot or more centred in the middle as with Airwair Merk III.

A bridge refers to the raised part between the heel and forefoot of a shoe.

# Bird & Bird

In addition, like the Airwair Merk III, the Primark sole does not have thin stripes in the middle of the sole, but thick bands with three thin grooves in them. In addition, Primark's sole has a completely

different back and front, with thin grooves and, finally, the profile on the front part of the shoe is not angled but straight on the shoe. All this gives a very different overall impression.

81- Here, too, Primark would like to ask you to look again at the image of the Primark sole and to consider whether the average consumer would really think - solely on the basis of this sole - that they would be able to determine the origin of the shoe.

*Primark lace-up boot with platform sole*

| Airwair Merk II | Primark product |
|---|---|



# Bird & Bird

®2- When comparing Airwair Merk II and the elevated Primark boot (hereinafter referred to as the **"Primark boot with platform sole"**), it is immediately noticeable that the Primark shoe is fitted with a completely different sole. The sole is at least three times as thick as the one in the trademark registration, has a

2

traditional straight (block) heel instead of a diagonal recess in the sole, contains several layers of grooves instead of continuous stripes that can be seen in Airwair Merk II, and has more and differently shaped inlets at the bottom of the sole. This element alone creates a complementary and different overall impression. The rest of the shoe also contributes to this. For example, the Primark boot has a zipper, an upright nose, a Heine instead of an oversized heel loop, no triple stitching at the transition between the shaft and the nose and unobtrusive stitching in the side of the sole's connection to bet (artificial) leather instead of bet's characteristic stitching on top of the rim between the shoe and the sole as in Airwair Merk II.

| Airwair Brand IV | |
|---|---|
| Primark oduct |  |

Also the equation between Airwair Brand IV and the sole of the Primark boot with platform sole runs directly affects the deviant dimensions. As noted above, the Primark sole also contains several different layers of grooves,[43] more and differently shaped inlets at the bottom and no diagonal recess in the sole, but a standard (block) heel.

*Interim conclusion in accordance with Article 2.20(2)(a) of the BTIP*

As described above, there is no similarity between the trade marks invoked and the signs used by Primark, let alone that they are identical signs as claimed by Airwair. Airwair's reliance on Article 2.20(2)(a) of the BTIP should therefore be rejected.

®5 Airwairs reference to ECJ *Arthur et Felicie in* no way detracts from this. In this judgment it was precisely stipulated that the criterion of equality between sign and trademark must be interpreted strictly.[44] A sign is only equal to a trademark if it *"without alteration or addition **depicts** all the components of the trademark"A5* Moreover, it cannot be stated in the present case that [262728]

---

[36] Primark repeats that also in comparison with the Primark lace-ups with platform sole, it is not possible to deduce from the registration of Airwair Merk IV what this actually protects. The image in the record shows only interrupted, horizontal stripes. It is not clear on the basis of the registration that these would be grooves.
« ECJ 20 March 2003, C-291/00 {Arthur *et Felicie)*, paragraph 50.
[38] Idem, r.o. 51.

# Bird & Bird

the differences between Primark products and the Airwair brands explained above are so insignificant that they can escape the attention of the average consumer.

### II.4.4.    No likelihood of confusion - no infringement under Article 2.20(2)(b) of the BTIP

The lack of similarity between the signs and the marks should also lead to a rejection of Airwair's reliance on Article 2.20(2)(b) of the BTIP.

The invoices listed above within the framework of validity will - 00k if the brands are deemed to be valid - have consequences for the distinctive character of the Airwair Brands. As explained above, the Airwair brands lack any distinctive character. If, however, it were to be assumed that the trade marks were still valid, only a very weak degree of distinctiveness could be attributed to them. It follows from the case law of the Court of Justice that the likelihood of confusion, as well as the risk of the relevant public associating another sign with the trade mark, decreases as the distinctive character diminishes A6 This has both an effect on the lack of infringement under Article 2.20(2)(b) of the BTIP, which is discussed in this section, and on the lack of infringement under Article 2.20(2)(c) of the BTIP, as will be discussed below.

It should also be kept in mind that with her Airwair Trademarks, the claimant will never be able to obtain protection for the general concept of a lace-up shoe with a coarse sole, or the concept of grooves on the side of a sole. Such an abstract concept is not a sign within the meaning of Article 2.1 BTIP.47 According to the ECJ in the *Dyson* case, it must be avoided that general concepts are accepted as a trade mark in order to prevent the trade mark right from being misused in order to gain an unjustified competitive advantage.4"

In this light - especially with shape marks such as the one at issue here - it is also necessary to ensure that the "imperfect image of remembrance", as advocated by Airwair, is not freely applied. If Airwair were to be allowed to extend the scope of protection of its trademarks in this way - even though it must be interpreted in a limited way - this would quickly lead to a party being able to monopolise a complete concept or style. Airwair does not look at the specific registration of its trademarks, but tries to derive from this the idea that the consumer will only get hung up on the fact that this is a lace boot with a coarse sole and that, as a result, anything that reminds one of a coarse lace boot would be similar and could cause confusion. This is already apparent from the fact that Airwair tries to "catch" several Primark boots that are quite different from each other under the same trademark right. However, trademark law does not lend itself to such a broad interpretation.[29]

# Bird ₅ Bird

9°- Considering the global assessment required by the ECJ, there can be no likelihood of confusion in this case. The signs and marks are not similar, the scope of protection of the marks relied on is limited and their

---

**29**[6 ECJ]    29 September 1998, C-39/97, at paragraph 29 (Canon/Cannon); ECJ 18 June 2009, C-487/07, at paragraph 44 (L'Oreal).
47 ECJ 25 January 2007, C-321/03 (Dyson), paragraph 29.
-i8 Idem, r.o. 34.

distinctive character low, and the average consumer is not accustomed to seeing marks such as those of Airwair iiberhaupt as an indication of origin. If the consumer is not aware of the word mark DR. MARTENS would have an idea about the origin of Airwair's shoes, then it is obvious that this is due to the characteristic, contrasting yellow colour of bet stitching on top of the sole and the black-yellow AIRWAIR branding on the exaggeratedly large fabric heel loop that is applied to the shoes of the bet brand. These elements are not protected by the trade marks invoked by the beer and are not reflected in Primark products either. Moreover, Primark products are only sold in its own shops and the similarity of the goods cannot be attributed much weight, as this will always be the case with moulded marks.

9       Even       if the average consumer would think of Airwair when looking at the signs allegedly used by Primark - i.e. the individual parts which Airwair considers to be in breach of the Airwair Trade Marks - which Primark contests, it is not sufficient for it to be assumed that there is a likelihood of confusion. This requires that the relevant public considers that Primark shoes originate from the same or an economically related company. That's never gonna be the case with beer.

### II.4.5.   Reputation of the trade marks invoked by Airwair not demonstrated

92-   In addition, there is no question of infringement under Article 2.20, paragraph 2(c) of the BTIP. First of all, Airwair failed to demonstrate the required awareness of the Airwair Brands. Airwair merely stated, but did not in any way renounce, that the market share, the intensity, geographical scope and duration of use, and the investments made by Airwair to publicise the brands in the Benelux would have given rise to a reputation for the brands. To substantiate this, it only refers - without further explanation - to Production 6.

93-   However, it is not up to the defendant or your Court to search the many hundreds of pages - which include Production 6, nine of the nine folders submitted by Airwair - for evidence to substantiate a claim made by the plaintiff. Airwair has therefore failed to fulfil its obligations in this respect.

94-   As explained above, many of the productions show only the word mark DR. MARDS, other shoes are shown, or the shoes are printed out unclearly.

95-   Airwair also refers to a number of famous carriers of the Dr. Martens products. The fact that these persons are known does not mean that the Airwair Brands would also be known automatically.

# Bird & Bird

96-   Primark emphasizes that this is not about the reputation of the word mark DR. MARKETS. Whether or not Dr. Martens is a well-known shoe brand is not in dispute. The question here is whether the specific trademarks invoked in these proceedings for interim relief - i.e. the specific shape of the side of the sole, the bottom of the sole and the appearance of the whole shoe - are known to the general public. Airwair did not provide any, or at least insufficient, evidence of this.

### II.4.6.   Undue advantage/violation of the distinguishing feature ability or reputation of the Airwair brands have not been demonstrated

97-   In its writ of summons, Airwair has failed to demonstrate in any way that the average consumer will

establish a link between Primark products and the Airwair Brands. It merely stated that, given the similarity between the signs and the marks, a link is evident. However, this is not enough and Airwair has failed to fulfil 00k's obligations in this regard. It is settled case-law, however, that the assumption of a link does not depend solely on the similarity of the signs at issue.w The existence of a link must be assessed globally in the light of all the relevant circumstances of the specific case.

98-    Airwair has also argued that Primark's use of the signs affects the distinctive character and/or reputation of the Airwair Marks. Without this condition, the Court of Justice held that a situation could arise in which economic operators appropriate certain signs to the detriment of healthy competition.s2 Airwair has not demonstrated, or even made plausible, any such change. The applicant merely claims that there is a risk of harm, as claimed by Airwair.

99-    Even if it were to be assumed that a link is made between the signs used by Primark and the Airwair Trademarks, this alone would not be sufficient to give rise to an unjustified advantage. 54 The substantiation that Airwair attempts to provide in section 42 of the summons also does not apply. First of all, it is noticeable that Airwair's argumentation is completely separate from the Airwair Brands. Airwair suddenly talks about the *"elements characteristic of the Dr. Martens shoes"* without indicating what is meant by this. If there is one thing that characterizes the Dr. Martens shoes, it is the contrasting, yellow colour of the stitching on top of the edge of the sole and the exaggeratedly large, fabric, black-yellow heel loop with the

ECJ 27 November 2008, C-252/07 {Intel*),* paragraph 45.
s Idem, r.o. 41.
5 [1] HvJ EU 14 november 2013, C-383/12, r.o. 37 (Environmental Manufacturing/EUIPO - Wolf); HvJ 27 november 2008, IER 2009/7 (Intel/Intelmark).
s[2] HvJ EU 14 november 2013, C-383/12, r.o. 41 (Environmental Manufacturing/EUIPO - Wolf), r.o. 41.
s3   Idem, r.o. 37.
s4   See, for example, ECJ 27 November 2008, C-252/07 {Intel*),* at points 32 and 71; ECJ 18 June 2009, C-487/07 {L*'Oreal/Bellure),* at point 37.
37-

# Bird & Bird

Airwair branding. These elements are **not** found in Primark products. Furthermore, the fact that Primark would have used similar colours is completely irrelevant. Beer is of such general colours as black, white and burgundy that it cannot be allowed for Airwair to monopolise it in any way. These colours are not reflected in the invoked Airwair Brands and Airwair has by no means shown that it is known for this.

TOQ. In short, there can be no question of infringement on the basis of Article 2.20 paragraph 2 sub c of the BTIP either.

### II.4.7.    No infringement under Article 2.20(2)(d) BIP

101-    As a last resort, Airwair tries to invoke Article 2.20 (2) (d) of the BTIP. As explained above, Primark primarily guarantees that there is no use as a trademark and that it cannot therefore infringe Article 2.20(2)(a) to (c) of the BTIP. However, Primark does not commit an infringement on the basis of subsection (d) of that article.

102-    As explained above, Primark cannot be prohibited under Article 2.23(1)(b) of the BTIP from using a sign that is not distinctive. In addition, Primark has already explained that there is no undue advantage or impairment of the alleged distinctiveness or reputation of the Airwair Marks. This means that

infringement is also excluded under Article 2.20(2)(d) of the BTIP.

**II.5. Interim conclusion**

103- In view of the above, it is clear that the Airwair Trademarks are not valid, or at least that there is no infringement of the Airwair Trademarks under (a), (b), (c) or (d) of Article 2.20(2) of the BTIP. Airwair's claims under trade mark law must therefore be rejected.

## III.    NO QUESTION OF COPYRIGHT INFRINGEMENT

104- In addition to Airwair's trademark claims, its copyright claims must also be rejected in their entirety. First of all, Airwair has simply failed to comply with its duty of attorney and its claims based on copyright should already be rejected on this ground. Primark will first of all explain that Airwair has in no way proved that it is a copyright owner. It will then be explained that the Dr. Martens shoes do not qualify for copyright protection at all. Finally, Primark will explain that also in the event that it should be assumed that the Dr. Martens shoes are protected by copyright and that Airwair is the copyright owner, there is no question of infringement on the part of Primark.

26

# Bird & Bird

**III.i. Airwair has not demonstrated that it is a copyright owner**

105-   On the basis of Airwair's writ of summons, it can in no way be established that Airwair is the copyright owner. Her bare statement in paragraph 10 of the writ of summons was not explained or substantiated in any way.

rob. from Dr. Martens' own website, Primark concludes that the German Dr. Klaus Martens - to which the brand owes its name - has actually only designed an "air-cushioned" sole to add to already existing army crates **fProduction 61.** Primark notes that bet beer apparently did **not** concern the sole invoked in this procedure, because the characteristic contrasting yellow stitching, the grooves on the side of the sole and bet pattern on the bottom of the sole were added only later. Also the top of the shoe has been changed later on.

107-   Whatever the "air-cushioned" sole of Dr. Klaus Martens may be, in i960 the English company Griggs would have obtained an exclusive *license for it*. But what does this licence entail? Where are the rights? Who is entitled to enforcement? Who exactly designed what? Is there a joint indivisible copyright of Dr. Martens and Griggs and have these rights ever been fully transferred to Griggs? Or is it a joint production of beer and what effect does this have on enforcement?

108-   And was bet actually Griggs who designed the shoes and soles? The first Dr. Martens shoes are made by bet separate company NFS, because Griggs allegedly didn't have the technology to make the shoes himself. But whether Griggs designed the Dr. Martens or whether this was actually NPS remains unclear **fProduction 7):**

# Bird5 Bird

## Chicken or Egg

In 1901, also in Northamptonshire, a manufacturer called **Griggs** sprang up. As far as we can tell, they and NFS were in friendly competition, although the two brands became rather tangled together in the late 1950s. It's hard to tell if Dr. Martens or Solovair came first, but regardless, the folks at Griggs heard of an air-cushioned sole made by a Dr. Maertens in Austria and acquired exclusive rights to the patented air-cushioned sole. The only issue was that Griggs had neither the technology to make these new-fangled soles, nor a way to **Goodyear welt** these soles to their characteristic leather uppers. This production moved to NFS and the very first pair of Dr. Martens was made, not by Dr. Maerten, nor by the company who had the license to make them.





Dr. Martens by Solovair Imagt wa Well Dressed Dad.

What's unclear is whether or not Solovair was independently developed by NFS or happened to coincide with the introduction of Dr. Martens' technology. Did NFS merely have the equipment to Goodyear welt the air-cushioned sole developed by Maertens to the Griggs' boot or did they have this equipment precisely because they'd pioneered this similar air- cushioned sole tech? Regardless of this chicken or egg situation, Solovair was created and many Dr. Martens shoeboxes were printed with "by Solovair" starting in 1960 and petering out in the 1990s.

109.
In addition, according to the British Trade Register, the plaintiff - Airwair International Limited - was not established until 13 January 1995 **(Productie_8).** Airwair has by no means explained to 00k how any rights would ever have ended up with her. All this is completely unclear.

no.
With regard to the 2976 and the JADON, Primark does not even have any indication as to whether and how the copyrights ever ended up at Airwair.

…i
n.
Since Airwair has not even laid down the basis for being a copyright owner in its writ of summons, it should not be admitted further in the proof thereof.

112.
Even assuming that Dr. Martens shoes are protected by copyright - which is not the case as will be explained below - it has not been demonstrated that Airwair is entitled to invoke this copyright. Its copyright claim should already be rejected for this reason.

# Bird & Bird

### III.2.        Dr. Martens shoes not protected by copyright

With regard to the copyright protection of the 1460, 2976 and Jadon boots, Airwair invokes a combination of different design elements (see Airwair Production 7) and also appears to claim in paragraph 12 of the writ of summons that 00k is entitled to copyright protection for these individual design elements.

114- According to the Supreme Court, in order to qualify for copyright protection it is required that the work has its own original character and bears the personal stamp of the author.ss The European Court of Justice applies the criterion that it must be the author's own intellectual creation6 .

115- According to the High Council of 00k, these criteria apply to utensils. 57 More specifically, the condition of an individual, original character means *"that the form may not be derived from that of another work".5& The* requirement that the product bears the personal stamp of the creator means that there must be creative choices.sss According to the Supreme Court, everything that *"has a form that is so banal or privial that no creative work of any kind can be demonstrated behind it"* falls outside of this[303132333435]. *With a view to* industrial design, the Supreme Court has added that 00k elements of the work *"which merely serve a technical purpose or are too much the result of a choice limited by technical principles"* are excluded from copyright protection.[36]

116- Hit de *Heksenkaas judgment* of the ECJ also states that a work must not only satisfy the abovementioned requirement of originality in order to be eligible for copyright protection, but that it must also be identifiable with sufficient precision and objectivity, since both the courts and other economic operators *must be able to 'clearly and precisely identify what is protected by copyright for the benefit of third parties, in particular competitors'.* This is also required for reasons of legal certainty.[37]

117' Already on this condition of protection the argument of Airwair is flawed. In her writ of summons, she gives the impression that she is claiming copyright in relation to a combination of specific design elements, but if one then looks at what those elements consist of, it becomes clear that this has not been specified at all. According to Airwair, in relation to the 1460, for example, the combination includes *'the design of the outsole ('DMS'j', 'the characteristic outsole' and,* more generally, *'the design of the whole shoe'.* Similar vague descriptions can be found with the Jadon and the 2976.

# Bird & Bird

These design elements, and thus the combination as a whole, are insufficiently delimited and the 'work' invoked by Airwair therefore does not meet the requirement that third parties be able to clearly and precisely determine what is protected by copyright.

119- This is not only relevant for smells and flavours, as was discussed in the *Witch's Cheese case*, but also for

30 HR 30 May 2008, LJN BC2153, NJ 2008/556, Sons Endstra/New Amsterdam, vol. 4.3.
5  ← EU 16 July 2009, Case C-5/08, LJN BJ3749, NJ 2011/288, Infopaq I, para. 37.
s? HR 12 April 2013, LJN BY1532, Stokke/Fikszo, IER 2013/50, r.o. 4.2, sub (b).
s8 HR 30 May 2008, UN BC2153, NJ 2008/556, Sons Endstra/New Amsterdam, vol. 4.5.1.
34 HR, ibid., rov. 4.5.1.
35 HR, ibid., rov. 4.5.1.
36 HR 12 April 2013, UN BY1532, Stokke/Fikszo, IPR 2013/50, paragraph 4.2(c); HR 16 June 2006, UN AU8940, NJ 2006/585, Kecofa/Uncome, paragraph 3.3.2.
37 ECJ EU 13 November 2018, C-310/17 *(Levola/Smilde),* paragraph 40-41.

the design of utilitarian objects. The broad description advocated by Airwair carries a high risk that it will be allowed to monopolise an entire style. That cannot be the intention of copyright.

12°‐ In addition, the individual design elements mentioned by Airwair do not meet the originality test either. These elements are derived from earlier designs or from a general style, are functionally determined and also banal. After all, we are even talking about elements such as eight lacing holes or the application of - without further specification - a "hiellus".

121‐ However, the combination of these design elements does not qualify for copyright protection either. Primark will then demonstrate in respect of each of the designs invoked by Airwair that both the individual elements and the combination are not eligible for copyright protection.

### III.2.1. 1460 shoe

122‐ As you can read on the website of Dr. Martens (**Production 61.**), the Dr. Martens shoe was originally designed from a fully functional point of view. After Dr. Klaus Martens broke his foot, he designed a shoe that would contribute as much as possible to a better recovery and more comfort. On this website ment also calls it a *"modest work-wear boot that was even sold as a gardening shoe at one stage"* and a *"utilitarian boot".*

123‐ Consequently, many of the features of the 1460 are entirely technical in nature and therefore do not qualify for copyright protection. For example, a heel loop serves to tighten the shoe and an insole is primarily provided with a profile to give the shoe grip on the surface. The number of lacing holes is logically determined by the height of the shoe - and is banal by the way - and a boot is usually fitted with a back strap and/or heel piece to prevent the back of the shoe from collapsing after it has been in use for some time. The stitching in the edge between the upper and the outsole of the shoe also serves a technical purpose and provides an extra good connection between the sole and the upper leather. C.II, Airwair uses a so-called 'Goodyear-welt'. This is an industrial process for the manufacture of double-stitched shoes that takes its name from the inventor Charles Goodyear Jr., who invented the inside sewing machine in 1874 (**Production ₀**).

**63** See Article 9(2) of the TRIPS Treaty and Article 2 of the WIPO Copyright Treaty. Cf. ECJ 7 December 2006, Case C-306/05,
  SGAEE/Rafael Hoteles, paragraph 35; ECJ 16 July 2009, Infopaq/DDF, paragraph 32.
⁷⁵ See for example HR 28 June 1946, *NJ1946/712* {Van *Gelder/Van Rijn).*

<span style="color:blue">Bird</span> & <span style="color:blue">Bird</span>

Technically, this is considered to be one of the best methods of bet manufacturing shoes. But copyright does not involve any creative choice and this is certainly not attributable to Airwair.

124. moreover, many of the elements individually mentioned by Airwair are in themselves so trivial that they do not qualify for copyright protection at all.

125- Also in terms of design, the shoe is not original. Since Dr. Klaus Martens designed the shoe while he was recovering as a young soldier, bet is not so strange that the 1460 hardly differs from a standard army boot or workman's shoe. The design of the 1460 does not differ in terms of overall impression from the average army boot from the 40s. During the Second World War the Americans wore the following Type II service boots as standard:



www.atthefront.com

The Canadians also had a similar standard "Ammunition boat" during the Second World War:



Since 1937, German soldiers have also been equipped with both a pair of boots and a pair of *"Schntirschuhe":*

# Bird S Bird



Soldiers stationed in the mountains were given coarser boots with a clumsy appearance:

127- Just like the sole of the 1460, this sole has the appearance of multiple layers, or grooves.

Further examples of commonly used army boots can be found in **Production io.**

The working-class shoes from the 1920s to the 1950s also give no other overall impression than the 1460s by Dr. Martens (see **Pruduclie ll'** for more details**).** The American brand Red Wing has been making working-class shoes since 1905. It is also called the "classic American work shoe" and the same models are still in production:



# Bird & Bird

129- At the end of the 1920s - during the greatest economic depression of the twentieth century - she became known for



*Aifaertistng jlyt'r on the 99e Depression shoe; the item Ktis nwr listed in a re&nlnv company catalog.*

her 99-cent boot:



**at that it!**

**because**
.Vot 99 a black waxed • pill, with plain earkor*. Sold ovti> in In  ■ umxb          Is II          t

**THE**
DALLAS,     TEXASRED

**No. 99 Is priced at 99c—**

price ⋀   ⋀ out oS a hundred will buy

**it's priced right**
Inihcr doub lrr and ronipa  Wide laxls and parked following ra*
In ID    R to 9                                                    In

**RED WING**
WING, MINN.



**SHOE CO.**

In the 1930s the Harvester was designed for miners and farmers:



This shoe is still being made:

# BirdS Bird



13°- The Wolverine brand has been making similar working-class shoes since 1903, as well as many other companies witnessing the many advertisements from the 50's and earlier in **Production n.** Even the two-tone sole of Dr. Martens is nothing new, as witnessed by the Red Wing shoes above as well as the next advertisement from 1937:



1937 Men's work boots

34

Bird & Bird




132- The above makes it clear that the individual design elements of the 1460 are not subject to copyright. The examples given also clearly show that even the combination of the elements for which Airwair wishes to invoke copyright protection is by no means original. After all, the same combination underlies the various soldiers' and workmen's shoes that were already on the market. The combination of elements in the 1460 therefore does not bear witness to the creative choices required to meet the copyright originality criterion. The combination reflects no more than a general, very common style. What Airwair is actually trying to do here is monopolize this style. That cannot be allowed.

### III.2.2.   Jadon boot

133' With regard to the Jadon boot it is first of all striking that Airwair does not understand the "Jadon" as a specific design, but at least two different designs. Thus, in the writ of summons at paragraph 54 and in Airwair Productie 7, it not only mentions the Jadon Platform ('**Jadon I'**), but 00k mentions the Vegan Jadon II Mono Platform ('**Jadon II'** and collectively the **'Jadon').** As 00k shows from the website of Dr. Martens, there are many more different "Jadons" (**Production _tn)._** It is not entirely clear then what Airwair is referring to.

134- The Jadon - whether it's the Jadon I or the Jadon II - has Airwair in its Production 7 with the same characteristics as the 1460, with the exception of the sole. This is not surprising, because in the description of the Jadon on the Dr. Martens website she herself admits that the design of the Jadon is derived from the traditional Dr. Martens boot with 8 lacing holes: the 1460 (**Production 14.').** She herself states that all the original features of this shoe have been retained and that only a _"chunky, empowering platform sole"_ has been added.[38]

Bird & Bird

earlier a version with platform sole (**Production** IS and see also Airwair Production 6.B.IX for some images from 1995 of boots with "<u>double</u> welt soles"):

---

[38]35-A  such a thick platform sole, however, in combination with a lace boot 00k, has been known for years. For example, in 2012 Grinders already had a boot with an extra thick sole, as did NFS and 00k Dr. Martens himself.



136- All the individual design elements of the Jadon were therefore already known, as well as the combination of these elements. The Jadon is then not eligible for copyright protection. In fact, Airwair did not make any creative choices. Airwair has only built on previous, common and free style elements. This is a form of imitation of style for which Airwair cannot expect copyright. Since the 1460, as explained above, is not eligible for copyright protection, 00k de Jadon cannot benefit from copyright protection in the absence of additional creative elements that meet the work test and could justify protection.

137- The Jadon also contains the same technically determined features as the 1460, which means that 00k on grand of technical determination with regard to the Jadon can not be a matter of copyright protection.

### III.2.3.  2976 Chelsea boot

tSS. Finally, Airwair tries to claim copyright in the classic design of the Chelsea boat. The Chelsea boot is a classic ankle boot with elastic inserts on the side, which was designed in 1837 by the cobbler of Queen Victoria, J. Sparkes-Hall fProduction **16)**. The shoes were a big favorite of the Queen. At the beginning of the 20th century the shoes became popular as horse riding boots and were worn on a daily basis, especially until the First World War. Companies like Baxter have been making the Chelsea boat since 1850 and R.M. Williams since 1950 (**Production 17).** In the 60's the Chelsea boots became very popular again after they were picked up by the Beatles. And for years now, all the horse girls have been walking through the stable with Chelsea boots.

139- It is therefore unacceptable that Airwair would now be allowed to monopolize such an old design. She mentions the "chelsea boot design" as a separate copyright protected element with respect to the 2976.[6r>] However, Airwair did not in fact have a new creative element.[39]

# Bird & Bird

added elements that would meet the working test independently. Her 2976 is just a Chelsea boat with the traditional features. In the absence of added originality, there is only a repetition of already known design. The required own, original character is lacking. No copyright protection is available for an imitation. Otherwise, every designer could re-use an already known design and use this reuse as a basis for infinite "evergreening" of copyright protection. However, copyright expressly provides for a limited term of protection. This basic rule should not be eroded by allowing new protection for an old design.

---

[39] The difference between this characteristic and the last characteristic, 'the design of the whole shoe', is completely unclear for Primark.

### III.3.     No copyright infringement

14°- Finally, 00k applies in the event that copyright protection of the Dr. Martens shoes is to be assumed, that there is no question of infringement of these copyrights by Primark.

14    40-What          Airwair is trying to monopolize in this dispute is not the specific design of the 1460, the Jadon and the 2976, but a general style. This is not what copyright is for. As the Supreme Court has ruled in *Broeren/Duijssens* and *Decaux/Mediamax,* following the same style does not mean that it is an imitation of a work under the Copyright Act.[41][42]   After all, copyright law does not give an exclusive right to a person who works according to a certain style, even if that style is characteristic of him or her. If this were the case, it would constitute an unacceptable restriction of the freedom of creation and would act as a brake on cultural developments. 6?

142-   Airwair therefore has no monopoly on the concept of a lace boot or Chelsea boat with a big mess. The fact that Primark's products and those of Dr. Martens both fall within the style of army boots and Chelsea boots cannot lead to an infringement of copyright.

143-   If you look beyond that style, you will see that the parties have expressed this in a completely different way. This is evidenced by the detailed comparisons between the Dr. Martens shoes and Primark products in **Productions 18.₁₀ and 20.**

144-   In support of the alleged infringement of its copyrights, Airwair only included a table in paragraph 54 of the writ of summons, in which both the Dr. Martens shoes and the allegedly infringing Primark products are barely visible. Even the larger photos in Production 11 by Airwair remain too vague to make a clear comparison.

145* Hiema will briefly discuss with Primark the different overall impression with regard to the three Dr. Martens designs that have been invoked.

## Bird ₅ Bird

*id6o shoe*

146-   The overall impression of the 1460 has the appearance of a classic, sturdy army boot, in which certain elements immediately stand out:

   a.     the exaggeratedly large, fabric hiellus with characteristic yellow-black Airwair branding;

   b.     bet characteristic, contrasting yellow stitching on top of the sole rim;

   c.     the light, semi-transparent sole made of PVC with a glossy finish;

   d.     the clumsy nose as known from army coffins;

405°- The overall impression of the Jadon II is even more minimalist, but here too certain elements are immediately noticeable:

   a.     The exaggeratedly large, fabric hiellus with yellow-beige Airwair branding, used by Airwair for its vegan shoes;

   b.     the diagonal shape of the bridge, creating the impression of an inlet in the sole instead of a more traditional block heel;

   c.     the glossy finish at the bottom of the grooves on the sole; and

---

[41] HR 29 March 2013, ECLI:NL:HR:2013:BY866l *(Broeren/Duijssens),* paragraph 3.5. following on from HR 29 December 1995, *NJ1996*, 546 *(Decaux/Mediamax),* paragraph 3.4.
[42] According to HR 29 March 2013, ECLI:NL:HR:2013:BY866i *(Broeren/Duijssens),* r.o. 3.5.

e.   the tight vertical rearbies; and

f.   Bet triple stitching at the transition from the shaft to the nose that is enhanced by the larger stitches and the color of bet stitching that differs from the rest of bet stitching.

147-  Primark lace-ups, on the other hand, give the impression of a classic women's lace-up boot due to their pointed and flatter nose and their modest stitching. The sole also attracts less attention because of the matte, black finish. The Primark lace-up boot is also equipped with a zipper and a separate heel piece. All the elements mentioned that determine the overall impression of the 1460 are missing in the Primark lace-up boot.

148.  The overall impression is therefore completely different. This applies to the black, burgundy and white versions of Primark lace-ups.

*Jadon boot*

149-  The overall impression of the Jadon I boot gives a minimalist look, in which certain elements immediately stand out:

a.   the exaggeratedly large, fabric hiellus with characteristic yellow-black Airwair branding;

b.   bet characteristic, contrasting yellow stitching on top of the sole rim;

c.   the diagonal shape of the bridge, creating the impression of an inlet in the sole instead of a more traditional block heel;

d.   the glossy finish at the bottom of the grooves on the sole; and

e.   The heel piece must be longitudinal to the front. [1]

# Bird & Bird

d.   The dark, non-contrasting rings around the lacing holes create a completely monochrome - "mono" - look, in which only the exaggeratedly large Airwair hiellus stands out in terms of colour.

15    [1-In]   contrast, Primark lace boots with platform sole have a much more robust appearance. The sole gives the impression of a car tyre with alternating grooves and flat areas and has a traditional block heel. The contrasting silver rings around the lacing holes also stand out directly in the bet design. As with the 1460, all the elements that determine the overall impression of the Jadon I and the Jadon II do not appear in the Primark lace-up boot with platform sole.

*Primark Chelsea boat*

152-  The 2976 and the Primark Chelsea boat are both the same type of boot. But that alone cannot, of course, provide a consistent overall impression, since Airwair cannot monopolise this concept - which has been around for decades - and so it can only be a matter of its specific elaboration. If one looks beyond the type of shoe, one notices that the 2976 is characterized by a play of round lines:

a.   The elastic inserts on the side of the boot, which are characteristic of a Chelsea boat, end up in a round shape at the bottom;

b.   The top of the shoe next to the elastic inserts also have a round shape - this round line is also visible from the front and back of the shoe;

c.   The seam connecting the nosepiece and the shaft has a flowing line running far forward;

   d. the diagonal shape of the bridge, creating an impression of an inlet in the sole instead of a more traditional heel;

   e. Finally, like the other Dr. Martens shoes, the overall impression is dominated by the exaggeratedly large, fabric, black-yellow hiellus.

153. The Primark Chelsea boat has a much more angular design. This is immediately noticeable in the form of the elastic insert, but also the top of the shoe next to the elastic insert. Even the nose of the shoe is less curved and the seam that connects the nosepiece and the shaft is straighter with only a slight curvature. The sole is also equipped with many more closely spaced inlets, creating a very strongly profiled sole.

154. By cutting the design of the different Dr. Martens shoes into different elements, Airwair tries to attribute her design to Primark's products.[43]

# Bird & Bird

this will not be accepted. With elements like a "hiellus" one captures just about every (army) boot or Chelsea boat on the market and also *"the design of the whole shoe"* is so vague that it is completely unclear what should be understood by this. Apart from the fact that this does not comply with the delimitation test in the *Witch's Cheese judgment*, as mentioned above, such a vague definition will also lead to enforcement problems in practice.

tbb. But even if one looks at the design elements listed by Airwair in the subpoena, it soon becomes clear that the two boots do not match:[44]

  *id6o shoe*
- Characteristic i: Primark lace-up boots do not have any stitching in the edge between upper and outsole of the shoe;
- Characteristic 3: The grooves on the side of the sole of the Primark lace-up boots are many coarser than that of the 1460 and the edge of the strip between the upper and outsole - which is not a separate strip for Primark - is not darker in colour;
- Characteristic 4: With respect to attribute 4 it is completely unclear what Airwair will do with this.
  ...means. As regards the side of the sole of Primark lace-ups, it should be noted that it does not have the same shiny semi-transparent, two-tone sole as the 1460s and that the shape of the sole of Primark lace-ups is also more rounded.
- Characteristic 5: Primark lace-ups do not have the characteristic, exaggeratedly large, fabric yellow-black loop with Airwair branding, but contains only a small (art) leather hiellus that runs from the rearbies and has a purely functional purpose;
- Characteristic 6: As discussed above in the trade mark law section, the sole of the Primark veterinarians completely different from the sole that was claimed in Airwair Merk III and was applied on the 1460. In a copyright sense, it can also be noted that the undersole of the Primark lace-up boot also lacks the light, semi-transparent effect and the glossy

---

[43]In addition,  the characteristics have been described much too mim. Especially when it concerns non-original individual elements, which also largely have a technical and functional starting point, it is possible to

[44] Primark uses the design elements listed in Airwair Production 7.

finish of the undersole of the 1460.
- Characteristic 7: also with respect to character 7 it is not clear what Airwair does with this.

...means. However, it is immediately noticeable that Primark lace-ups have a more pointed, less clumsy nose, a separate heel piece, a shorter back straps, no striking triple stitching at the transition of the shaft and the nose, coarser laces, etc. For further differences, reference is made to **Production 18.**

_Jadon boot_
- Characteristic 1: Primark lace-up boots with platform sole do have a

black stitching, but this is not on top of the edge between the upper leather and the

# Bird & Bird

sole as with the Jadon, but on the side of this rim and this is almost absent between the overlapping plastic of the rim of the sole. This stitching also has a technical function;
- Characteristic 3: The grooves on the side of the sole of the Primark lace-up boot with

The platform sole give the impression of a car tire, because the sole is not equipped with continuous grooves, but by different strips of grooves and flat parts that alternate. Also, the sole of the Primark product does not have a darker coloured strip between the upper and the sole, as stated on the design elements of the Jadon in Airwair Production 7;
- Characteristic 4: Primark lace-ups do not have the characteristic,

exaggeratedly large, fabric yellow-black or yellow-beige loop with Airwair branding, but contains only a small (art) leather hiellus that runs from the rearbies and has a purely functional purpose;
- Characteristic 5: As noted above with respect to the 1460 it is absolutely

It is unclear what Airwair means by characteristic 5. With regard to the shape of the sole of the Primark veterinarians with platform sole, it should be noted that it has a straight heel instead of a diagonal recess in the sole, that the sole does not extend downwards like the Jadon, and that the inlets have been placed differently. The positioning of the inlets is also the result of the pattern on the underside of the shoe, which was designed by Vibram - and therefore does not belong to Airwair - and was also determined entirely technically.
- Characteristic 6: Also characteristic 6 is unclear. However, in comparison with the Jadon I

directly note that the Primark lace-up boot with platform sole does not have a heel piece and contains a continuous backstrap. The Primark product also features more striking rings around the lacing holes and stitching along the lacing holes. These last two points are even more striking when compared to the Jadon II, as it differs significantly from the minimalist one-colour design of the Jadon II.

In the context of the comparison of the alleged design elements of the Dr. Martens designs and the Primark products, Primark also refers again to the detailed comparisons in **Production 18.10 and 20.**

157- It should also be remembered that the individual design elements of the Dr. Martens shoes were already known. Therefore, if there is copyright protection on the Dr. Martens designs - which is disputed by Primark - then this only applies to the combination of design elements. This, of course, has an impact on the scope of protection and means that only very limited protection is available at work. Where in such a case the combination has not been

fully taken over, according to established case law this will soon lead to a different overall impression. 6? This is the case here.[45]

# Bird & Bird

15^- Airwair therefore demonstrates an incorrect starting point in which it states in paragraph 55 of the summons that it is not necessary for all the characteristics of a work to have been copied in exactly the same form in order to speak of copyright infringement. As mentioned above, the individual design elements are not original and therefore the acquisition of an element *as such* cannot constitute copyright infringement.

159- Furthermore, copyright infringement in respect of utilitarian objects is based on a comparison of the overall impression. [0 The] copyright-protected features are paramount in this respect. As explained under the discussion of copyright protection, the Dr. Martens shoes hardly have any copyright-protected features that could play a role in the context of the infringement question. The design elements are largely functionally determined, banal and/or derived from earlier works or a general style.

i6o. Nevertheless, the central question in copyright infringement in a utility object is *"whether the allegedly infringing work exhibits the copyrighted features of the earlier work to such an extent that the overall features [...] do not differ sufficiently for it to be concluded that the former work could be regarded as an autonomous work"?* This test therefore also includes a modified reproduction within the meaning of Article 13 of the Aw, as quoted by Airwair in paragraph 55 of the writ of summons, and does not allow for a separate test on the transfer of individual design elements from a utilitarian object. It is about the overall impression that different elements added by Primark should not be overlooked, and that a different combination of known style elements, independently determined by Primark, should not be overlooked. Airwair cannot - contrary to settled case law - unilaterally change this perspective to its advantage by artificially zooming in on individual details (which, moreover, as explained, are no more than familiar and common stylistic elements). The overall impression criterion ensures that copyright protection does not become too burdensome for progress in the cultural sector, and that additions and divergent design decisions by competitors are taken into account.

1^1- In short, because the overall impression of the Dr. Martens shoes and the Primark products does not correspond and even the incorrect list of characteristics of Airwair has not been complied with, copyright infringement is excluded.

## III.4.    Interim conclusion

In view of the above, Airwair's copyright claims must be rejected. Airwair has made insufficient assertions in this regard and has not provided any evidence that it is a copyright owner. Moreover, the Dr. Martens shoes do not comply with the work test. Even

---

ECLI:NL:RBDHA:20l8:32l2 *(Just Brands/Qak),* r.o. 4.9 & 4.16; Vzr. Rb. The Hague 16 November 2017,
ECLI:NL:RBDHA:20i7:i3293 (Diesel/Calvin *Klein), r.o.* 4.9-4.10.
﹐ HR 12 April 2013, LIN BY1532, Stokke/Fikszo, IER 2013/50, r.o. 4.2, sub (e).
HR 29 November 2002, LJN: AE8456, Una Voce Particolare, paragraph 3.5.

---

[45] Hof Arnhem 28 September 2010, IEF 9124, .ro. 4.3 *(Deltex B.V./Jade B.V.);* Rb. The Hague 17 March 2016,
ECLI:NL:RBDHA:20l6:2825, paragraph 4.13 (*P.M.P. Furnishing B.V./Easysofa*)\ Rb. The Hague 28 March 2018,

# Bird & Bird

if copyright protection and copyrights were to be assumed, there would still be no infringement.

## IV.   NO QUESTION OF SLAVISH IMITATION

Finally, in only three very brief paragraphs, tbS Airwair attempts to invoke slavish imitation. However, this does not apply either.

164. When the design of a product is not or no longer protected by an LE right, the basic principle is that imitation is permitted. [2] Even if it benefits from the efforts of a competitor and also if that competitor would be disadvantaged. This principle is only deviated from under certain conditions, but in the present case it is not met.

### IV.i. No own position in the market

TbS In order to assume slavish imitation, it is first of all necessary for there to be a distinct face on the market. Airwair has argued that the Dr. Martens shoes have their own place on the market in the Netherlands, but it has by no means substantiated this. Primark notes in advance that the duty to report and the burden of proof in this respect lies with Airwair, since it invokes slavish imitation. Airwair thus failed to comply with this.

tbb.   Airwair recognizes in Section        60 of the subpoena that it needs to be its own face
assessed on the basis of   whether the external appearance of a product is
is different from the rest of the market. This follows from the *Mi Moneda judgment* of the Supreme Court.73
Popularity, fame or a large market share cannot in themselves provide a distinct face on the market.

[1b7]- The *Umfeld* on the Dutch market has to be looked at. As can be seen from **Production** 21. 22 **and** 23, for each of the Dr. Martens in question there are innumerable shoes on the market that correspond to these models. Therefore, it cannot be said that the 1460, the Jadon or the 2976 have their own position.

In support of its                  alleged own face on the market, Airwair refers in the
Only a summons to a  combination of elements of its products that it lists in
However, as the above productions show, these elements are very common on the market, both individually and in combination. Moreover, many of these elements are also functionally defined, as explained above in the discussion of copyright protection. Airwair's thesis that other shoes

[22] Including HR 20 November 2009, *NJ* 2011/302 m.nt. J.H. Spoor *(.Lego/Mega Brands)*, HR 19 May 2017, *NJ* 2017/315 m.nt. D.W.F. Verkade *(All Round/Simstars)* also known as HR *Mi Moneda*, and HR 19 May 2019, *NJ* 2019/332 m.nt. Ch. Gielen *(Capri Sun/Riha)*.
[73] HR 19 May 2017, ECLI:NL:HR:2017:938 *(Mi Moneda)*, paragraph 3.5.2.

# Bird & Bird

do not have the 'specific Dr. Martens characteristics' on the market is therefore incorrect if it is assumed that Airwair is also referring to the elements mentioned in paragraph 12.

tdQ- Even if the Dr. Martens shoes ever had their own face, the concept of "own face" is not a static fact, and that this has been diluted in the meantime by the litany of other similar products on the market, as can be seen from the overview in **Productions** 21. 22 **and** 23. Once again, the burden of proof for proving that the Dr. Martens shoes have an own

position lies with Airwair. However, in the light of the above, Primark has disputed with sufficient reason that any difference with the Umfeld is so small that a position of its own cannot be assumed.

### IV.2. No confusion

[1]7°* Even if the Dr. Martens products do have their own face, there is no confusion, as explained above in the context of trademark law.

[17]    [46]-No    consumer will confuse Primark's products with Airwair's shoes. First of all, Primark products are only sold in its own stores, where it only sells products under its own brands. Secondly, Primark products do not contain the very elements that might make a shoe like Dr. Martens look like this: the yellow accents can be found in the stitching in the edge between the upper leather and the sole of the shoe, and in the heel loop. These are the elements that characterize the Dr. Martens shoes and these elements immediately catch the eye.

[172-]    Primark also points out that the mere link with Dr. Martens - if any, which Primark disputes - is not sufficient for the assumption of confusion in the context of the doctrine of slavish imitation. After all, this would offer protection for a kind of free-riding - similar to sub c under trademark law, but the doctrine of slavish imitation does not protect against this. This is logical, because the starting point is precisely that, in the absence of a IE right, imitation is allowed, even if the imitator benefits from it and also if this would be to the detriment of a competitor. The requirement is that the relevant public should be of the opinion that Primark products have the same origin as Dr. Martens shoes. That will never be the case here.

### IV.3. Primark products deviate sufficiently

[173-]    Even if, unexpectedly, your court should assume that there is a risk of confusion, Primark has deviated sufficiently. For a more detailed explanation of the differences, Primark refers to **Productions 18, 10 and 20.**

## Bird & Bird

The manufacturer shall not deviate much from this without detracting from the soundness and usefulness of a (certain type of) shoe.

### IV.i. Slavish imitation does not provide additional protection for style

[175-]    Should your court nevertheless consider that there is confusion and unnecessary imitation, then in the present case this will not be sufficient to assume slavish imitation. After all, it follows from the *Broeren/Duijssens* Supreme Court that slavish imitation does not offer any additional protection against following a certain style, even if as a result confusion would arise and there would be unnecessary imitation.[74]

### IV.2. Primark has not slavishly mimicked

Finally, Primark purchased its products as a finished product and did not design or commission them to be designed in

---

[46]In addition,    many of the "specific Dr. Martens features" are functioned determined, such as, for example, a
    stitching in the edge between the upper and outsole of the shoe, a heel loop and laces. This has already
    been explained above in the context of copyright law.
        These 'characteristics' are simply characteristics of the concept of 'shoe', and here you can also find

such a way. It follows from case law that there can be no question of slavish imitation at all, since Primark has not imitated anything.75

177- Airwair has not established, let alone proved, any additional circumstances in respect of which Primark's conduct is nevertheless unlawful towards it, despite the fact that Primark did not design the products or have them designed. Also for this reason a claim on grand of slavish imitation or otherwise unlawful acts on grand of Section 6:162 of the Civil Code must be rejected.

## V.    AIRWAIR CLAIMS

tyS. in the unlikely event that your court should find that there has been any infringement of Airwair's intellectual property rights or that there has been slavish imitation, Airwair's claims shall be subject to the following:

179- Certainly in view of the many characteristics that Airwair attributes to the Dr. Martens shoes, the fact that several versions of the Jadon exist, and the discussion about the question when this will be infringed, Airwair's claim 2 is too vague. This claim must - in order to avoid unnecessary enforcement disputes - be limited to the offering for sale and sale of the allegedly infringing Primark products mentioned in the summons. The same applies to the prohibition of unlawful acts claimed under 3 above. [47][48]

# Bird & Bird

1®°- Moreover, Primark cannot be required to comply with the prohibitions demanded by Airwair under i, 2 and 3 immediately after service of the judgment. A period of one week is reasonable in this respect.

iSi. With regard to claim 4, according to established case law, Airwair has no urgent interest in receiving information about the profits made by Primark. [6] This is only relevant for the calculation of the alleged damage, for which compensation can only be claimed in proceedings on the merits. Airwair 00k did not claim a separate urgent interest in this claim. According to the Supreme Court, each individual claim must be examined in the light of the criterion of urgency.77 In the absence of a statement of reasons for the separate urgent interest, such a claim must be rejected. [8] According to established case law, there is no interest in an auditor's report drawn up by an independent chartered accountant either, as this can offer no further certainty than a statement by the defendant.79 Finally, *"all information known to Primark Netherlands B.V."* is far too broad and undetermined.

The recall demanded under 5 should also be rejected, as Primark has no professional buyers and a recall is only appropriate for professional buyers other than consumers. [80] The requirement that copies and receipts should be sent to Airwair by courier is not necessary.

1®3- In addition, the penalties claimed by Airwair are disproportionate and must therefore be rejected, or in the alternative, be moderate. An amount of EUR 500 per product - let alone an amount of EUR 10,000 at a time - is disproportionate to the selling price of Primark products. As Airwair's Production 4 shows, these are for sale for an amount of EUR 19 or EUR 22. A periodic penalty payment should be a sufficient incentive to comply, but not a criminal penalty. An amount of EUR 50 per product is therefore more than sufficient. Finally, there is no limit

---

[47] HR 29 March 2013, ECLI:NL:HR:20l3:BY866l *(Broeren/Duijssens),* paragraph 3.6.
[48] See for example Hof's-Hertogenbosch 29 January 2013, ECLI:NL:GHSHE:20i3:BZi057 (Melano Quiges), paragraph 7.6.4; Hof's-Hertogenbosch 7 July 2015, ECLI:NL:GHSHE:20is:2508 (Fairground attractions), paragraph 3.4.14; Rb. Gelderland 20 December 2018, ECLI:NL:RBGEL:20i8:5739 (Kletspot), paragraph 4.5.

to the amount of the periodic penalty payments claimed by Airwair.

## VI.   EDUCATIONS

184- Primark provides evidence of all its claims by all means permitted by law, including, in particular, the hearing of witnesses and experts and other expert's evidence. However, it does not accept any burden of proof that does not rest on it by law.

---

? [6] See, for example, the Court of Appeal of The Hague on 13 February 2018, ECLI:NL:GHDHA:20l8:270, paragraph 4.7; Vzr. Rb. The Hague on 14 November 2017, ECLI:NL:RBDHA:20i7:i3iog, paragraph 4.31; Vzr. Rb. The Hague on 18 July 2019, ECLI:NL:RBDHA:20l9:796l, paragraph 5.51. HR 23 April 1999, NJ 1999, 612, paragraph 3.3; HR 14 April 2000, NJ 2000, 489 (HBS/Danestyle), paragraph 1.2.

[78] Rb. The Hague 18 April 2013, ECLI:NL:RBDHA:2013:BZ7844, para. 4.15; Rb. The Hague 21 August 2009, ECLI:NL:RBSGR:2009:BJ7097, para. 4.26; Rb. The Hague 19 February 2008, ECLI:NL:RBSGR:2008:BG3739, paragraph 2.19; Rb. The Hague 31 July 2007, ECLI:NL:RBSGR:2007:BBii26, paragraph 4.14;

[79] See for example Rb. Den Haag 7 augustus 2018 (fzr.), ECLI:NL:RBDHA:20i8:9453, paragraph 4.23; Rb. Den Haag 14 november 2017 (fzr.), ECLI:NL:RBDHA:2017:13109, paragraph 4.31; Rb Den Haag 12 October 2016, ECLI:NL:RBDHA:20l6:l22l3 (L'Oreal v. defendant).

[80] See for example Rb. Amsterdam 2 November 2010, ECLI:NL:RBAMS:20io:B02o6o7, paragraph 5.4; Rb. Overijssel 17 October 2018, ECLI:NL:RBOVE:20i8:3902, paragraph 4.8.

# Bird & Bird

**VII.    PRODUCTIONS PRIMARK**

Primark will bring the following productions into play as soon as possible:

| | |
|---|---|
| **Production    i:** | Proof of filing of invalidity actions against the Airwair Marks to the BOIP; Information on |
| **Production    2:** | the uneven finish of the side of a sole; |
| **Production  3:** | Examples of products that were on the market at the time of the filing of the Airwair Brands; |
| | Objection by the Spanish trade mark office to trade marks under Airwair trade mark III; |
| **Production  4:** | Withdrawal of Spanish marks pursuant to Airwair mark III; |
| | Print out website Dr. Martens - History; |
| **Production    5:** | Article Heddels about the Solo shoe; |
| **Production    6:** | Excerpt from the British Trade Register Airwair International Limited; |
| **Production    7:** | Wikipedia article about the "Goodyear welt"; |
| **Production    8:** | Overview of common army boots; |
| **Production    9:** | Overview of common working-class shoes from the 1920s to the 1950s; |
| **Production10:** | Information about the Vibram Carrarmato sole; |
| **Production  11:** | Screenshot Dr. Martens website - different Jadon models; |
| **Production  12:** | Screenshot Dr. Martens website - Jadon I and Jadon II; |
| **Production  13:** | Previous models of similar lace-up boots with platform soles; |
| **Production14:** | Artikel "Chelsea Boot" in *Shoe Innovations. A Visual Celebration of 60 Styles;* Overzicht |
| **Production  15:** | van historische Chelsea boots; |
| **Production16:** | Detailed equation 1460 and Primark veterinarians; |
| **Production  17:** | Gcdctaillccrdc comparison Jadon and Primark veterlaars with platform sole; Detailed |
| **Production18:** | comparison 2976 and Primark Chelsea boat; |
| **Production19:** | Overview of boots on the Dutch market according to the 1460; Overview of boots on the |
| **Production  20:** | Dutch market according to the Jadon; Overview of boots on the Dutch market according to |
| **Production  21:** | the 2976. |
| **Production  22:** | |
| **Production 23:** | |

# Bird *8,* Bird

## WITH CONCLUSION:

ISs. Primark requests your court to dismiss the claims of Aiwair.

1.86. Primark claims that Airwair should be ordered to pay, on a provisional basis, reasonable and proportionate legal costs, such as lawyers' fees, and other costs incurred by Primark in the context of these proceedings as referred to in Section 1019b of the Dutch Code of Civil Procedure, with the proviso that statutory interest will be payable on that award of costs as from fourteen (14) days after the date of the judgment to be given in this respect. To this end, Primark will timely bring a full specification of these costs into dispute.

Advocaat

131-1937 was also the year of the first rubber profile soles. This was also the case for the design of the 1460s for years. In 1937 Vitale Bramani designed the Carrarmato sole fProduction **12')** under the brand name Vibram**.** This sole is generally seen as the first design of a profiled non-slip sole: